# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GWENDOLYN A. DIXON, STACIE ALEXANDER, and TASIA PRICE, individually, and on behalf of the class and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>INKTEL CONTACT CENTER SOLUTIONS, LLC,<br><br>*Defendant*. | CLASS and COLLECTIVE ACTION<br><br>Case No.: 1:25-cv-20924<br><br>Jury Trial Demanded |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Gwendolyn A. Dixon, Stacie Alexander and Tasia Price (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to others, against Inktel Contact Center Solutions, LLC ("Inktel" or "Defendant") as follows:

## INTRODUCTION

1.     Wage theft remains a pervasive issue across the United States, depriving workers of the wages they rightfully earn, and creating significant financial and emotional strain on individuals and families. It occurs when employers refuse to pay their workers for all the wages and benefits that they have earned by engaging in practices such as requiring off-the-clock work, denying overtime pay, denying them benefits, or misclassifying employees as independent contractors. Such practices not only unjustly enrich businesses to the detriment of workers, they

1

also deprive governments of tax revenue, disadvantage law-abiding businesses, and erode the principles of a fair and equitable labor market. Defendant exemplifies these harmful and unlawful practices on a large scale.

2.      This class and collective action, brought by Plaintiffs on behalf of themselves and a class of current and former workers employed by Defendant as customer service and call center representatives, challenges Defendant's practices and policies of misclassifying Plaintiffs as independent contractors, not paying them overtime compensation, forcing them to pay a weekly surcharge to access the Inktel's system, and other employment benefits, violating the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA") and the Employee Retirement Income Security Act, 29 U.S.C. §§ 29 U.S.C. § 1001 et seq. ("ERISA").

3.      Defendant provides remote call center services to corporate clients, including many Fortune 500 companies. To meet its contractual obligations, Defendant has, over the years, recruited and trained hundreds of individuals that it classifies as independent contractors (collectively, "Contractors"). These workers are trained as customer service and call center representatives, and they perform tasks and have responsibilities that are identical to Defendant's employees, including voice, email, and chat-based customer service, technical support, and sales. Despite their central role in fulfilling Defendant's contractual obligations and business operations, these Contractors are misclassified as independent contractors, depriving them of critical wage and hour protections and statutory benefits.

2

4.      Defendant advertises schedule flexibility to attract workers but, in reality, Contractors are subject to strict oversight. They must adhere to pre-set schedules and follow specific, detailed instructions on how to perform their duties and interact with customers. Supervisors play a significant role in assigning work hours, approving schedule adjustments, and overseeing many aspects of their activities. Before starting work, Contractors are required to register on Defendant's virtual platform, for which they must pay a weekly fee to access. Supervisors also monitor their online activities, including actions performed outside of Defendant's system.

5.      If Contractors need to go offline for a quick restroom break, leave due to a family emergency, or request unpaid voluntary time off ("VTO"), they are required to obtain supervisor approval. Supervisors strictly regulate these activities, and Contractors who raise concerns about their schedules or attempt to adjust their working hours are met with warnings that failure to comply with Defendant's procedures could result in termination of their contracts.

6.      Plaintiffs and similarly situated Contractors regularly performed uncompensated labor, including being denied overtime pay, attending hours of unpaid meetings, and were denied pay due to system errors or technical failures. By denying these workers overtime pay and compensation for all hours worked, Defendant unlawfully shifts the cost of essential work onto the Contractors.

7.      Plaintiffs bring this class and collective action under the FLSA and ERISA to recover compensation and benefits unlawfully withheld by Defendant. Specifically, Plaintiffs seek to address the denial of access to group health insurance, retirement plans, and other benefits to which they are entitled as employees. On behalf of themselves and the proposed Class and

Collective, Plaintiffs seek unpaid wages, overtime compensation, liquidated damages, statutory penalties, restitution, injunctive relief, attorneys' fees, costs, and applicable interest.

8.      To promote clarity and compliance with Rules 8(a)(2) and 10(b) of the *Federal Rules of Civil Procedure*, Plaintiffs reorganize this Second Amended Complaint to separate and limit factual allegations for each claim, and each Count incorporates by reference only those factual paragraphs necessary to support that Count. This change cures the shotgun pleading concerns the Court identified under *Weiland* and its progeny.[1]

## JURISDICTION AND VENUE

9.      This court has original jurisdiction of this civil action as one arising under the laws of the United States. *See* 28 U.S.C. §1331. This Court has jurisdiction over the subject matter of this civil action pursuant to FLSA and ERISA.

10.     This Court has jurisdiction over Plaintiffs' claims under 29 U.S.C. §§ 216 and 217, and 28 U.S.C. §§ 1331 and 1345, to enjoin violations of the FLSA, restrain the withholding of back wages due under the FLSA, award additional amounts equal to back wages due as liquidated damages and ERISA claims under 29 U.S.C. § 1132(e)(1).

11.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and 1391(c) because a substantial part of the events giving rise to the claim occurred in this district, and Defendant is headquartered in this District, and, therefore, subject to personal jurisdiction in this District.

---

[1] *See* ECF No. 60 (citing *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015)).

## PARTIES

12.     Plaintiff Gwendolyn A. Dixon ("Dixon" or Plaintiff") is a resident of the state of Georgia who was employed by Defendant as a call center representative during the statutory period covered by this Complaint. Defendant misclassified Dixon as an independent contractor, charged her a weekly service fee to access their system, and did not pay her overtime and other benefits of employment. Dixon was an employee of Defendant pursuant to FLSA.

13.     Plaintiff Stacie Alexander ("Alexander" or Plaintiff") is a resident of the state of Texas who was employed by Defendant as a call center representative during the statutory period covered by this Complaint. Defendant misclassified Alexander as an independent contractor, charged her a weekly service fee to access their system, and did not pay her overtime and other benefits of employment.  Alexander was an employee of Defendant pursuant to FLSA.

14.     Plaintiff Tasia Price ("Price" or Plaintiff") is a resident of the state of Georgia who was employed by Defendant as a call center representative during the statutory period covered by this Complaint. Defendant misclassified Price as an independent contractor, charged her a weekly service fee to access their system, and did not pay her overtime and other benefits of employment. Price was an employee of Defendant pursuant to FLSA.

15.     Defendant Inktel is a Florida corporation with its principal place of business located at 8200 NW 33rd St #100, Miami, Florida 33122. Inktel is a global outsourcer of business services and direct marketing services. Inktel was founded in 1997 and services federal, state, and local government agencies along with various Fortune 500 companies. Inktel offers its workers the opportunity to work from home and has workers located across the country.

**FACTUAL ALLEGATIONS**

**DEFENDANT IS AN ENTERPRISE ENGAGED IN COMMERCE**

16.     At all times mentioned herein, Defendant was an "employer" of Plaintiffs and Plaintiffs were employees of Defendant, within the meaning of the FLSA. At all relevant times, Defendant was an enterprise engaged in the commerce or production of goods for commerce, within the meaning of the FLSA.  At all relevant times, Defendant has had annual gross revenues in excess of $500,000.

**CONTRACTORS ARE EMPLOYEES UNDER THE FLSA**

17.     Defendant provides business process outsourcing services, including customer and call-center support, to large corporate clients (e.g., Roadside Protect, Sephora, and Pandora), and utilizes both W-2 employees and a nationwide group of remote call center agents whom it classifies as 1099 independent contractors ("Contractors"). For clarity in this pleading, "Contractors" means only remote call center agents nationwide whom Inktel classified as 1099 independent contractors while providing customer and call-center support services for Inktel and its clients; the term excludes Inktel's W-2 call center agents and excludes non–call center 1099 vendors (e.g., plumbers, electricians, painters, cleaners, arborists, I.T. consultants, or strategy firms).

18.     It connects its workforce—many of whom are classified as independent contractors but some of whom are employees—to its clients through a virtual platform. Like their employee counterparts, Contractors handle customer interactions via phone, email, and chat, providing vital services to Defendant's clients.

19.     Plaintiffs and all similarly situated Contractors were/are employees of Defendant pursuant to FLSA.

6

20.     Defendant is/was Plaintiffs' and all similarly situated Contractors' employer pursuant to the FLSA.

21.     Under the FLSA's economic realities test, workers are employees, not independent contractors, if their work is (1) controlled by the employer, (2) integral to the employer's business, (3) subject to company-imposed conditions, (4) devoid of meaningful opportunities for profit or loss, and (5) performed under strict oversight. *Solis v. A+ Nursetemps, Inc.*, No. 5:07-cv-182, 2013 U.S. Dist. LEXIS 49595, at *14 (M.D. Fla. Apr. 5, 2013). Defendant's control over Plaintiffs' schedules, work methods, and performance metrics demonstrates that they function as employees, but are unlawfully classified as independent contractors and are entitled to overtime compensation under FLSA.

22.     In *Julie A. Su v. Arise Virtual Sols., Inc*., 2024 U.S. Dist. LEXIS 239942, *9, the court used a six-factor analysis of "economic dependence" is used in the Eleventh Circuit:

(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

(4) whether the service rendered requires a special skill;

(5) the degree of permanency and duration of the working relationship; and

(6) the extent to which the service rendered is an integral part of the alleged employer's business.

7

23.     If a business exercises significant control over individuals such that they are not "separate economic entities" who are "in business for themselves," then this factor weighs in favor of an employee classification. *Id.* (quoting *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013).

24.     Defendant exercises significant control over the Plaintiffs and all similarly situated Contractors such that they are not "separate economic entities" who are "in business for themselves," evidencing that the Plaintiffs are employees. *Id.*

25.     Defendant maintains a workforce of full-time W-2 employees performing identical call center and customer service tasks, yet only independent contractors are required to pay the $9.98 weekly fee, provide their own equipment, and forgo access to health benefits and retirement plans. Despite the distinction, both groups follow the same strict schedules, scripted interactions, and monitoring requirements. Unlike W-2 employees performing the same core call-center duties, all Contractors were required to pay a weekly platform access fee (approximately $9.98) that was deducted from compensation.

26.     Defendant's operations depend on its Contractors, who perform tasks integral to the company's business model. Without the labor these Contractors provide, Defendant would be unable to fulfill its obligations to its clients. Defendant employed Plaintiffs and other similarly situated Contractors to provide these services in accordance with specific terms already negotiated by Defendant with its customers. Contractors do not exercise managerial skills or business judgment to affect their profits or losses, and the work performed does not require any special skills or initiative. Contractors must provide these services to Defendant's customers in the manner and time dictated by Defendant. Contractors must not deviate from the guidelines and instructions

8

provided to them by Defendant. Refusal to adhere to these instructions results in disciplinary action or contract termination.

27.     Defendant exercises significant control over its Contractors' schedules. Contractors are required to adhere to pre-determined schedules and seek supervisor approval for changes, including requests for time off or adjustments due to emergencies. Contractors are assigned fixed shifts and told when they have breaks and lunch. Deviations from the mandated schedule, even minor infractions, such as logging off five minutes early, are met with warnings from Defendant. Approval from Defendant is required before taking any VTO. Plaintiffs, like all other similarly situated Contractors, worked overtime hours for which they were not paid overtime wages. Contractors were assigned fixed schedules, required to clock in and out at specific times, adhere to pre-scheduled breaks and lunches, and obtain managerial approval for deviations. The foregoing scheduling controls applied uniformly to Contractors nationwide.

28.     Defendant's supervisors provide explicit, detailed instructions on how tasks and communications with clients must be performed and monitor compliance using digital surveillance tools. Contractors must follow specific protocols dictated by Defendant and its clients, including scripts and guidelines for customer interactions. Contractors are regularly informed that they are required to follow verbatim scripts provided during training in day-to-day work and are instructed on how to handle calls from customers, dispatch support, and engage in chat support, leaving little room for independent decision-making. Contractors must obtain approval from Defendant before dispatching payments exceeding a certain amount.

29.     In addition to providing these online support services, Contractors must attend mandatory meetings in accordance with instructions from their supervisors. During these meetings,

Contractors must abide by instructions from their Inktel supervisors, including, for example, activation of web-cameras. Refusal to attend or comply with instructions from supervisors is grounds for discipline or contract termination.

30.     Defendant's supervisors also conduct regular audits and performance reviews of the Contractors to ensure they are meeting internal company standards. Supervisors regularly remind Contractors of attendance policies and warn that any deviation may result in contract termination. Deviations from internal company guidelines are grounds for discipline or contract termination.

31.     Plaintiffs were required to use their own equipment but are subject to real-time monitoring and surveillance by Defendant. Contractors must configure that equipment to meet Defendant's specifications, and Defendant exercises invasive control over Contractors' computers, at times without prior authorization, tracking communications, activity, and even being able to alter aspects of software beyond the platforms Defendant uses for customer interactions. Defendant requires Contractors to pay a $9.98 weekly charge to access Defendant's virtual platform, which is automatically deducted from Contractors' paychecks. Additionally, Defendant opened credit cards in Contractors' names that were to be used only for business purposes.

32.     Plaintiffs and similarly situated Contractors were not paid for any work before or after logging into Inktel's platform. By way of example, this included, but is not limited to, not being paid for attending meetings, system errors, technical failures, roll over calls, team updates, system updates, client updates, team reminders, team coaching, one-one-one coaching with Defendant's supervisors, team meetings and inclement weather issues. The unpaid time included pre-shift boot-up and login sequences necessary to access multiple platforms.

33.     Plaintiffs and similarly situated Contractors would frequently find themselves waiting on Defendant supervisors for a substantially long time for approval. This would affect their service ratings and, in turn, limit their ability to work additional hours, pick their schedules, and overall maintain their contracts. In addition, Contractors were required to log in early to access multiple platforms before their shifts (unpaid boot-up time) and were not paid for time spent resolving system failures, extended calls that ran past scheduled shifts, or mandatory post-shift tasks.

34.     Defendant requires its Contractors to sign independent contractor agreements (the "Agreement") that are misleading in both content and effect. These agreements state that "each party ... agrees that it is and will always ... be deemed an independent contractor. Each party will have exclusive control of the manner, means, location, and details of accomplishing the services that it contracts to provide... neither party may control the manner in which the other party meets its contractual obligations." These provisions are crafted to give the impression that Contractors will operate as truly independent contractors, free to determine how they meet their contractual obligations. In reality, however, the agreements are a façade designed to mislead Contractors into believing they will have autonomy while Defendant exercises substantial and overwhelming control over virtually every aspect of their work. The Independent Contractor Agreements contained materially identical provisions across programs, including behavioral standards, confidentiality and IT obligations, and restrictive provisions governing solicitation and interaction with Inktel's clients.

35.     Contrary to the language of the agreements, Defendant does not treat its Contractors as independent. Instead, it imposes strict controls over their schedules, work processes, and

11

performance metrics. Contractors are required to follow detailed instructions from supervisors, attend mandatory meetings and training sessions, and submit written and oral reports on their work—all practices inconsistent with the terms of the Agreement. For example, while the agreements explicitly state that "none of the meetings nor online sessions are mandatory and are completely voluntary to attend," Contractors are routinely required to attend training and performance reviews under threat of losing their contracts.

36.     Contractors have no ability to negotiate the terms of the independent contractor agreements and must accept them as presented to begin work with Defendant. Contractors are paid an hourly rate, and their work is devoid of meaningful opportunities for profit or loss based on their own skill and effort.

37.     Defendant prevents Contractors from working with multiple clients, further curtailing their independence and controlling their ability to earn income. For example, Contractors who sought to service more than one client through Defendant were often denied or pressured not to do so, despite language in the agreements suggesting otherwise. This level of control is fundamentally incompatible with the concept of independence and demonstrates that Defendant's classification of its workforce as independent contractors is nothing more than a cost-saving measure to avoid providing legally mandated wages, benefits, and protections.

38.     Defendant has exclusive control over Plaintiffs': hiring, firing, pay, schedules, scheduled breaks, supervision, digital surveillance, contracts, vacations, personal time, and disciplinary actions. Inktel's control extended to live monitoring of computers and calls, enforcement of verbatim scripts, and discipline for deviations, limiting autonomy identical to that of W-2 agents.

39.     Defendant's Contractors do the work at the very heart of the company's business- Inktel could not operate its customer support business without customer support Contractors.

40.     Unsurprisingly, Inktel employs full-time employees who regularly perform the same work as the Contractors. The work performed by both the full-time employees and the Contractors are integral to Inktel's business. Inktel requires W-2 employees perform identical support functions as the Contractors. Despite the considerable control Inktel exerts over Contractors, it uniformly misclassified them as independent contractors to ensure Inktel continues to receive the $9.98 payments, to avoid paying taxes and overtime, and to avoid providing benefits. However, the Contractors are not independent contractors; rather, they are Inktel employees and are entitled to avoid the $9.98 weekly fees, entitled to overtime pay, and entitled to the benefits that Inktel employees—who have identical job responsibilities and perform identical tasks—enjoy.

**DEFENDANT VIOLATED ERISA**

41.     Defendant mischaracterized Plaintiffs as independent contractors instead of employees to avoid the significant financial costs of providing them with employment benefits, insurance coverage (medical, dental, vision and life), 401(k) plan, and misled Plaintiffs into believing that Defendant could exclude them from participation in such plans.

42.     Defendant offers valuable employee benefit plans, including a 401(k) plan and medical, dental, vision and life insurance, which are available to individuals classified as employees and who meet specific eligibility requirements, such as working a designated number of hours over a particular period, as outlined in the respective benefit plans' terms and agreements.

43.     Plaintiffs and all similarly situated Contractors have been unlawfully excluded from Defendant's employee benefit plans as a result of Defendant's deliberate misclassification of them

13

as independent contractors. This misclassification has also interfered with their ability to attain rights and benefits protected under ERISA.

44.     Plaintiffs and other similarly situated Contractors were employees of Defendant and were therefore entitled to participate in these employee benefit plans. Defendant's wrongful exclusion of Plaintiffs and others from these ERISA-protected benefit plans has caused significant harm, depriving them of benefits they were rightfully entitled to as employees. Plaintiffs have suffered financial injury and damages as a direct result of Defendants' actions.

## PLAINTIFF – GWENDOLYN DIXON

45.     On July 19, 2023, Dixon started working for Inktel Contact Solutions, as an independent contractor. From July 2023 through March 2024, Dixon was the dispatch agent for Roadside Protect, one of Defendant's clients. Dixon provided dispatching services for roadside assistance services and customers that had claims, whether personal or commercial. Dixon was later assigned to Sephora on March 8, 2024. Dixon's Sephora contract was abruptly terminated on March 29, 2024. Dixon's daily work life mirrored that of a W-2 employee, yet she was classified as an independent contractor, effectively denying her the benefits, overtime compensation, and other legal protections enjoyed by the W-2 employees.

46.     From the outset, Dixon's schedule was strictly controlled by Defendant. Initially, Dixon was listed in Defendant's payment system as a W-2 employee; however, at the end of the three-week training period, her status was changed from W-2 and she was "reclassified" as a 1099 Contractor. From that point on, she was assigned a fixed schedule that required her to clock in and out at specific times, adhere to pre-scheduled breaks and lunches, and obtain approval for any deviations. If a call extended beyond her scheduled break or shift, she was forced to either forfeit

14

the break or continue working unpaid. Supervisors strictly monitored her attendance, adherence, and productivity, enforcing performance metrics identical to those imposed on W-2 employees.

47.     Dixon frequently worked beyond her scheduled hours due to extended customer calls. When another worker raised the issue concerning the hourly rate for hours worked beyond 40 in a week, Dixon's supervisor, Justin Rodriguez, publicly stated that independent contractors were not eligible for overtime pay. Additionally, Dixon was required to perform unpaid work, including (but not limited to) boot-up time and technical downtime. Dixon had to log in early to prepare multiple systems before her shift but was not compensated for this time, and she was not paid for time lost due to system failures, even though W-2 employees received compensation in such situations. In addition, Dixon was forced to attend meetings and training sessions that were unpaid.

48.     As one of many examples of Defendant's failure to pay Overtime Pay, for the pay period August 14, 2023 – August 20, 2023, Dixon worked 65.88 hours according to Defendant's records and was not paid overtime pay at time and half for hours worked. (DEF 00212). This assumes that Defendant's records were reliable and accurate, which Plaintiffs' allege is not the case.  More specifically, Defendant failed to maintain correct time records.

49.     Throughout Dixon's employment with Defendant, she was required to pay $9.98 to access Defendant's virtual platform. All similarly situated Contractors are required to pay the access fee.  The fee is deducted from the contractor's paychecks.

50.     Unlike W-2 employees, Dixon and similarly situated Contractors are required to use their own equipment while being subject to Defendant's remote monitoring software, which had access to her system beyond work-related platforms.

51.     In early 2024, Dixon's ability to work independently was severely restricted.  Dixon discovered that Defendant had deeper access to her system than expected. She noticed the Inktel logo in her system's search bar, even before logging into Defendant's platform, indicating that Defendant had access to her computer beyond its customer service platform. Dixon and other workers were monitored in real-time, had their calls recorded and reviewed, and were penalized for deviating from Defendant's strict service scripts. Breaks and lunches were rigidly scheduled, and she had to request permission from supervisors to step away from her computer, even for a brief moment.

52.     Despite being classified as an independent contractor, Dixon was, on at least one occasion, provided paid time off, a benefit typically reserved for W-2 employees.

53.     In late 2023, Dixon was given paid leave following the death of her grandmother, demonstrating that, in effect, Dixon was treated as an employee while being denied full protections of that status.

54.     Dixon began questioning her classification in early 2024, particularly after being required to work overtime without commensurate pay and to follow strict company-imposed guidelines.

55.     On January 1, 2024, in a Teams chat Cedric Jerome advised he was monitoring Dixon's calls with Roadside customers.

56.     On January 23, 2024, Dixon asked Rodriguez if he could schedule a Q&A session with the original training group to discuss inconsistencies regarding Defendant's independent contractor policies. Rodriguez declined, stating he was available for one-on-one discussions but would not facilitate a group meeting.

57.     On February 5, 2024, Dixon received an Appreciation Gift and Acknowledgment from Defendant evidence that Dixon performed the duties and responsibilities of her job.

58.     In February 2024, Dixon had an incident with team lead Cedric Jerome regarding a two-hour customer call that extended into her lunch break. When she asked Jerome to reassign the call, he refused. Dixon escalated the issue to Rodriguez, explaining that Defendant was exerting too much control over her work to justify her classification as a 1099 contractor.

59.     In March 2024, Dixon applied for an additional Sephora contract, which offered a higher hourly rate ($1.20 more per hour). After being approved and onboarded into Defendant's system, Dixon was suddenly informed that she could not service both clients at the same time due to an alleged "billing system limitation."

60.     On or about March 6, 2024, Dixon received a notification from her manager prompting her to log in for her Sephora training. Dixon was also scheduled to work for Roadside Protect that same day. Management informed Dixon that she would no longer be servicing Roadside Protect and cancelled her contract.

61.     On March 7, 2024, Dixon contacted Human Resources to address her concerns about Defendant cancelling her Roadside Protect contract after management allowed her to interview and secure the contract with Sephora.

62.     Defendant had direct control over Dixon and the similarly situated Contractors by supervising their every actions through Team Chats, on-call monitoring and online monitoring.

63.     On March 7, 2024, Dixon received an urgent Teams chat from Justin Rodriguez and Christinia Kuenker, Roadside Director of Operations, which stated: "Re: Roadside Overview and Processes – This is very important we adhere to all processes in the special instruction

17

section…This seems to be a recurring issue with agents at your site.  Please get communication out to all agents that overviews must be followed."

64.    On March 11, 2024, Dixon met virtually via Teams with Maybal Wall and Kelly Angel in Human Resources. The meeting lasted about 30 minutes. Dixon addressed concerns that she was being misclassified as a 1099 contractor.

65.    On March 19, 2024, Dixon received an email acknowledging her complaints to Human Resources and supervisors of being misclassified.

66.    On March 29, 2024, in retaliation for complaining about being misclassified as a Contractor, Dixon's contract was terminated, without a written explanation. Her termination came just weeks after she formally raised concerns about misclassification and labor law violations.

67.    Dixon is suffering from ongoing headaches, loss of sleep, chest pains, stress, weight gain, and emotional instability due to Defendant's adverse actions.

**PLAINTIFF – STACIE ALEXANDER**

68.    On July 19, 2023, Stacie Alexander began working for Defendant. Alexander was hired as a dispatcher, responsible for coordinating roadside assistance services for customers. Like Dixon, her role and job responsibilities mirrored those of Defendant's W-2 employees, yet she was misclassified as Contractor. Initially, Alexander was listed in Defendant's payment system as a W-2 employee; however, at the end of the three-week training period, her status was changed from W-2 and she was "reclassified" as a 1099 Contractor. Throughout her employment, Alexander reported directly to supervisors Justin Rodriguez and John Escobar, before eventually being reassigned to a person named "Tenoa." Her employment with Defendant was characterized by

strict scheduling requirements, unpaid work, excessive monitoring, and retaliation for raising concerns about workplace policies that violated ERISA and the FLSA.

69.     From the beginning of her employment, Alexander had no autonomy in setting her schedule. She was assigned fixed shifts and was required to clock in and out at exact times. All break and lunch times were pre-scheduled and enforced rigidly, leaving no flexibility in her workday. If a customer call extended into her break or shift ending time, she was required to remain on the call without additional pay. Leaving early or logging off outside of the scheduled time was considered non-adherence, leading to warnings and potential contract termination.

70.     Despite being classified as a Contractor, Alexander had to comply with strict attendance and adherence policies, including, requesting supervisor approval for all time off, being reprimanded for taking too many restroom breaks, and being removed from the system for supposed "non-adherence." Supervisors claimed that these removals were automated, but Alexander believed they were manually controlling the system to reduce her hours without formally terminating her.

71.     On April 12, 2023, Alexander received – "Memo from Inktel Management to All Roadside Protect Program Staff Re: Professionalism" stating: "Intel Employees are expected to conduct themselves professionally at all times, please see the below as outlined in our Employee Handbook, etc".

72.     On April 12, 2023, Alexander had a Teams Chat conversation with John Escobar re: complaint from client [Roadside, client to Defendant] and Jennifer Deloah getting on her call to assist.  Alexander advised John Escobar of her fear of retaliation from Defendant in the Teams Chat.  Alexander stated: "I am fearful of losing my "contract and would prefer everything in

writing moving forward." "I would much rather contact HR regarding this matter as I do not feel it's confidential."

73. On May 12, 2023, Alexander received – Memo from Inktel Management to All Roadside Protect Staff Re: Schedule, Adherence, Timeclock and Ultipro which stated, "All Employees need to log in Daily and take (breaks) and lunch ON TIME and return ON TIME." "Any additional unapproved activity will affect your schedule Adherence."

74. On Aug 2, 2023, Alexander left a message in Teams for John Escobar.  Escobar called Alexander and verbally reprimanded her for complaining about waiting 25 minutes or longer off the clock for approval from supervisors and team leaders.  Escobar told Alexander: "She had to wait they help everyone."  She stated, "As a contractor I should be able to work freely and make my own decisions."

75. On Aug 23, 2023, John Escobar sent a message on Teams reminding Alexander to clock in and out for lunch.

76. On or around September 13, 2023, Justin Rodriguez coached Alexander on not pushing back on service providers.  Alexander stressed that she thought it was the best decision and as a Contractor and she should be able to make that call.  Justin instructed her to adhere to client's needs.  Alexander replied to Justin, "The way Inktel manages and scores sounds like I am an employee."

77. On September 26, 2023, Justin manually altered Alexander's time and indicated so on a Teams chat.

78. On October 16, 2023, Alexander was offered an earlier shift from Justin in the same manner W-2 employees are offered shifts, without a shift bid.

79.     On or around Oct 17, 2023, Justin forced Alexander to clock out for over 4 hours due to Inktel system issues. Alexander worked with Sayan Bocanegra in the IT department during the four hours off the clock.

80.     On or around November 2023, Alexander worked around 4 hours of overtime but was paid at regular rate of $16.80 per hour, she notified Justin Rodriguez and was told he would forward to Operations Manager, John Escobar.  Alexander never received overtime pay and was not contacted by anyone from payroll or Human Resources.

81.     At the end of November, first of December 2023, there were conversations in Team Chats supervisors Justin Rodriguez and Chenoa McKinney about shift bids.

82.     At the end of December 2023, John Escobar had a meeting with Alexander saying she was abusing her breaks and lunches and she could lose her contract.  Alexander told him that as a Contractor, she should be able to take her breaks and lunches at her own will.

83.     On December 12, 2023, Alexander received an email from Justin Rodriguez "Re: Break/Restroom Aux Overuse (cc: John Escobar)", "I am reaching out to remind you of our policy regarding your overuse or Break/Restroom time."

84.     On or Around February 10, 2024, Alexander had a conversation with Justin (Teams and verbally) about upcoming vacation and Justin said it would be considered PTO.

85.     On February 26, 2024, Justin Rodriguez requested days and was approved as PTO in Calabrio (Teams chat).

86.     Around March 2024, Alexander asked Justin for Teams meeting to discuss with other Contractors shift bid and additional concerns, Justin refused to meet with the group and agreed to meet only 1 on 1.

21

87.    In March 2024, a shift bid started on a day Alexander was off.  She did not participate in the shift bid because she thought it was unfair and unethical for Contractors to have to participate.  In retaliation, John Escobar took 1 hour from her daily schedule, said it was the only shift available.  Shortly thereafter, Alexander was rushed to the emergency room with extremely high blood pressure and stress due to work related issues.

88.    On April 5, 2024, sent an email to Justin Rodriguez and John Escobar Re: 2nd Notification for Schedule Adjustment and stated, "Again, I believe you have me misclassified as you do not adhere to my contract."

89.    On or Around April 5, 2024, Alexander complained about Chenoa McKinney not assisting and her attitude when Justin Rodriguez is out of the office.

90.    In retaliation for complaining, on or around April 10, 2024, Alexander was moved to Chenoa McKinney's team.

91.    On or around April 12, 2024, in retaliation Alexander was reprimanded by Justin Rodriguez for submitting a form regarding her pay.

92.    On or around August 23, 2024, Alexander complained to John Escobar about her time being changed in Defendant's system and asked if they could manually change time.

93.    On August 15, 2024, Alexander mailed Chenoa McKinney Re: issues logging in and not being paid while attempting to log in.

94.    On or around September 18, 2024, Alexander asked for a raise and was told she would have to renegotiate her contract.  She stated that the Defendant makes changes daily and the contract is not mentioned. In retaliation, later that day, Justin Rodriquez reprimanded her about her time.

22

95.     On or around October 3, 2024, in retaliation for Alexander's complaints, Alexander's scheduled changed again based on "company's needs" per John.

96.     On October 25 and October 28, 2024, Alexander had log-in issues due to Defendant's system and was not paid for an hour each day.

97.     On or around October 29, 2024, Alexander asked Justin Rodriguez in Teams chat about her call volume and whether her job was secure because her calls had decreased.  She was told, "nothing is wrong, job secure".

98.     On November 18, 2024, Alexander emailed John Escobar and Justin Rodriguez inquiring about not being on schedule after November 22, 2024. Alexander received on that same date, an email from John Escobar Re: Termination Effective 11/22/24 -- "Please be advised that due to reduction in available work hours, we will be terminating your contract effective November 24, 2024."

99.     Alexander worked overtime shifts without being compensated properly. From August to October 2023, Alexander regularly worked overtime shifts, assuming that Defendant would pay her time and a half for all hours worked beyond 40 in a given week. However, she quickly discovered that overtime pay was not provided. When she asked about the missing overtime pay, she was told that Contractors are not entitled to overtime wages, despite working the same hours and tasks as W-2 employees. Contrary to the language of the agreements, Defendant does not treat its Contractors as independent. Instead, it imposes strict controls over their schedules, work processes, and performance metrics. Contractors are required to follow detailed instructions from supervisors, attend mandatory meetings and training sessions, and

submit written and oral reports on their work—all practices inconsistent with the terms of the Agreement.

100.     As one of many examples of Defendant's failure to pay Overtime Pay, for the pay period August 14, 2023 – August 20, 2023, Alexander worked 71.16 hours and was not paid overtime pay at time and half for hours worked. (DEF 00080). This assumes that Defendant's records were reliable and accurate, which Plaintiffs' allege is not the case.  More specifically, Defendant failed to maintain correct time records.

101.     Like other Contractors, Alexander was required to pay a $9.98 weekly fee to access Defendant's virtual platform, deducted directly from her pay. She was also expected to provide her own equipment, yet Defendant had full access to her system, even beyond work-related software. In early 2024, Alexander noticed that "Inktel" appeared in her system search bar before she even logged in to the work platform, and when she raised this issue with her supervisor, "Tenoa," she never received a clear answer on what Defendant was tracking or why it had access to her personal computer.

102.     In March or April 2024, Defendant required workers to participate in a shift bidding process, which determined the number of hours they would be assigned. Alexander did not participate in the bid process, resulting in Defendant reducing her hours from 8 per day to 7. Alexander was terminated in November 2024.

### PLAINTIFF – TASIA PRICE

103.     On July 19, 2023, Tasia Price was hired by Defendant. Price was classified as a Contractor despite working under the same controlled conditions as W-2 employees.  Like Dixon and Alexander, Price was initially listed in Defendant's payment system as a W-2 employee;

however, at the end of the three-week training period, her status was changed from W-2 and she was "reclassified" as a 1099 Contractor. Price also worked as a dispatcher for Roadside Protect, handling roadside assistance requests and following Defendant's rigid call center guidelines. Throughout her employment with Inktel, Price was subjected to strict scheduling rules, unpaid work, wage discrepancies, and surveillance.

104.    Throughout Price's employment with Inktel Price experienced similar work and schedule restrictions. She was told that this was a "permanent" position, but Defendant ultimately terminated her without warning. She was required to clock out for bathroom breaks and strictly monitored for excessive breaks. Breaks were unpaid, and she was penalized for returning late, even if it was due to a long customer call.

105.    In September 2023, during a Teams Chat, Price communicated with Chenoa McKinney, Supervisor, about her concerns of being misclassified and not being paid properly.

106.    In November 2023, Inktel changed Price's schedule without consent or without cause.

107.    Throughout Price's employment with Inktel, she had to wait for VTO approval, even in emergencies. When Price needed time off to see her neurologist after undergoing two brain surgeries, she was initially told she could not take time off. She was eventually able to switch shifts with another worker, but the lack of formal leave policies caused her significant stress and anxiety.

108.    Throughout Price's employment Price also experienced underpayment and wage discrepancies. She was not paid time and a half for overtime hours, including when long calls extended past her shift. Unlike W-2 employees, she received no compensation for roll over calls or technical downtime. Additionally, the scheduling platform indicated that Price had paid time

off; however, in practice, she—like Dixon and Alexander—was rarely compensated for that time, except on rare occasions.

109.    As one of many examples of Defendant's failure to pay Overtime Pay, for the pay period August 14, 2023 – August 20, 2023, Price worked 75.32 hours (DEF 00250); July 22, 2024 – July 28, 2024, Price worked 67.26 hours and was not paid overtime pay at time and half for hours worked. (DEF 00300). This assumes that Defendant's records were reliable and accurate, which Plaintiffs' allege is not the case.  More specifically, Defendant failed to maintain correct time records.

110.    Price was also forced to pay $9.98 each week to use Defendant's systems, and she similarly noticed that Defendant was tracking her computer activity beyond simply its virtual platforms. Like a W-2 employee, Price experienced supervisor access to her notes and live monitoring of her calls.

111.    In February or early March, Price was forced to accept a changed schedule without cause or notice.

112.    In late April or early May, during a Teams Chat, Price asked Shanoy LNU, Supervisor, why she was not classified as a W-2 employee.  Shanoy replied that she thought Price was a W-2 employee.  Shanov advised Price that she would look into why she was misclassified as an independent contractor. Shanoy never advised Price of why she was misclassified.

113.    On May 7, 2024, Price mentioned to Cedric Jerome that she was misclassified as a 1099.  Jerome advised Price that he would raise the issue Justin Rodriguez, Manager.

114.    On May 7, 2024 and May 9, 2024, Price complained directly to Justin Rodriguez that she should be classified as a W-2 employee because she was being denied pay, benefits and

breaks.  Rodriguez responded that he would check with his supervisor, John Escobar. Justin Rodriguez never got back to Price regarding why was misclassified as a 1099 or why she was being denied benefits and pay.

115.    On June 19, 2024, Price advised John Escobar, Operational Supervisor, that she was having technical difficulties logging into Inktel's system which caused her to work off the clock and not receive pay.  Escobar disregarded Price's concerns and complaints and denied there were any technical difficulties.

116.    In June or July 2024, Price told her Team Lead, Cedric Jerome, that she needed to take her scheduled break but Cedric Jerome refused, telling her that she had to clock out before she could take her break because she was a 1099 employee instead of a W-2 employee.

117.    On August 9, 2024, Price was suddenly removed from the system in the middle of her shift while she was on a phone call with a customer.

118.    On August 10, 2024, Price received a termination letter at 1:38 AM, claiming there was "a lack of available hours." She was not given any prior warning about termination. Price was never offered a reassignment or chance to dispute the decision.

119.    Price is experiencing ongoing stress characterized by symptoms such as ongoing migraines, loss of sleep, chest pains, stress, weight gain, and emotional instability due to Defendant's adverse actions.

## COLLECTIVE ACTION ALLEGATIONS (FLSA § 216(B))—DEFINITION AND SCOPE

120.    Plaintiffs bring this action pursuant to 29 U.S.C. § 216(b) on behalf of themselves and a putative collective consisting of all remote call center agents nationwide whom Inktel

classified as independent contractors and who, within the applicable limitations period, provided customer and call-center support services for Inktel and its clients (the "FLSA Collective"). The FLSA Collective excludes W-2 call center agents and any other categories of 1099 vendors not performing remote call-center duties.

121.    Plaintiffs bring this suit on behalf of the following similarly situated persons:

> All current and former Contractors who have worked for Defendant nationwide during the statutory period covered by this Complaint and who worked overtime hours either recorded by Defendant's platform or unaccounted-for off-the-clock hours sanctioned by Defendant's managers and policy of misclassification.

Members of the FLSA Collective are similarly situated because they performed the same primary duties (remote customer-contact work following Inktel scripts), were subject to substantially identical Independent Contractor Agreements, worked fixed schedules with preapproved breaks, were subject to uniform monitoring and performance controls, performed unpaid pre-shift boot-up and other time, and were paid under the same compensation practices, including deduction of the weekly platform fee and the failure to pay overtime premiums for hours over 40 in a workweek.

122.    The foregoing definition and allegations provide clear notice of who is in the putative FLSA Collective by limiting the group to remote call center agents classified as 1099 Contractors who performed customer and call-center support services for Inktel and its clients, and by excluding W-2 agents and unrelated 1099 vendors.

123.    Plaintiffs reserve the right to modify or amend the definition of the proposed Collective before the Court determines whether certification is appropriate.

124.    Plaintiffs and other potential members of the Collective are similarly situated in that they all suffered unpaid overtime as a result of Defendant's purposeful misclassification of its contract employees and they are entitled to liquidated damages pursuant to the FLSA. The claims under the FLSA may be pursued by those who opt-in to this case pursuant to 29 U.S.C. § 216(b).

125.    Defendant has engaged in a continuing and willful violation of the FLSA.

126.    There are many similarly situated current and former Contractors engaged by Defendant who have regularly worked over 40 hours per week without receiving appropriate overtime pay, in violation of the FLSA. These Contractors have been intentionally misclassified as independent contractors. All of these Contractors perform similar, if not identical, job responsibilities, which are directed and controlled by Defendant. Contractors have designated at-home work areas where they respond to inbound customer inquiries via phone, email, and chat, using customer relationship management tools provided by Defendant to research inquiries, document customer interactions, and guide customers through troubleshooting processes. Contractors log all activities in Defendant's internal systems, maintain regular communication with supervisors, undergo mandatory group training for a specified period of time, attend meetings as directed, and are required to meet strict attendance and performance standards. They use their own personal electronic and digital equipment, which must comply with Defendant's technical specifications, including specific hardware, software, and internet connectivity requirements. These Contractors are known to Defendant, readily identifiable, and can be located and contacted using Defendant's records.

127.     All similarly situated Contractors would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit pursuant to the FLSA. Notice should be sent to the collective pursuant to 29 U.S.C. § 216(b).

## CLASS ACTION ALLEGATIONS

128.     Plaintiffs, on behalf of themselves and a Class of Contractors, and in accordance with Rule 23(b) of the Federal Rules of Civil Procedure, bring this action as a class action to recover benefits under Defendant's benefit plans.

129.     Plaintiffs bring this class action on behalf of the following Class:

> All individuals nationwide who, at any time during the six years preceding the filing of this Complaint, have performed work for Defendant as Contractors, were classified by Defendant as independent contractors, and were subject to Defendant's control and policies as described herein.

130.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers and directors, and judicial officers and their immediate family members and associated court staff assigned to this case.

131.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

132.     Plaintiffs allege they are entitled to unpaid benefits under Defendant's benefit plans, including Defendant's 401(k) plan and health and welfare plans, pursuant to Section 502(a)(1)(b) of ERISA, 29 U.S.C. § 1132(a)(1)(b).

133.     The proposed Class meet the criteria for certification under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3).

134.    Numerosity. This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Plaintiffs are informed, believe, and thereon allege, that the proposed Class contains at least hundreds of participants who have been damaged by Defendant's conduct as alleged herein, the identity of whom is within the knowledge of Defendant and can be easily determined through Defendant's records.

135.    Commonality. This action involves questions of law and fact common to the Class. The common legal and factual questions include, but are not limited to, the following:

    a.  Whether Defendant's misclassification of Contractors as independent contractors violates their rights under ERISA;

    b.  Whether Defendant exerted sufficient control over Contractors' work, schedules, and performance to render them employees under ERISA;

    c.  Whether Defendant failed to notify Contractors of their eligibility to participate in employee benefit plans, including health insurance, retirement plans, and other benefits, as required by ERISA;

    d.  Whether Defendant's classification of Contractors as independent contractors unlawfully deprived them of wages, overtime pay, and benefits in violation of ERISA;

    e.  Whether Defendant breached its fiduciary duties under ERISA by denying Contractors access to employee benefit plans and retaining the cost savings from the misclassification;

    f.  Whether Defendant breached its fiduciary duties by failing to administer its benefit plans in compliance with ERISA, including the obligation to notify eligible participants of their rights and benefits;

    g.  Whether Defendant failed to periodically review and ensure its classification practices and benefit plans complied with federal labor and employee benefit laws; and

    h.  The appropriate methods for determining damages, including unpaid wages, overtime, and lost benefits, on a class-wide basis for the Class.

136.     Typicality: Plaintiffs' claims are typical of the claims of the members of the Class because all Class members have been harmed by Defendant's uniform misclassification practices and the associated denial of wages, overtime pay, and employee benefits. Plaintiffs and the Class members were subjected to the same policies and practices, including being classified as independent contractors despite performing work under conditions that rendered them employees. Plaintiffs advance the same legal theories and claims on behalf of themselves and the Class, asserting violations of the FLSA and ERISA. Additionally, Plaintiffs seek relief based on the same factual allegations, legal standards, and causes of action as the other members of the proposed Class.

137.     Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs and members of the Class were similarly harmed by Defendant's uniform misclassification practices, which deprived them of wages, overtime pay, and access to employee benefits, including health and welfare plans. Plaintiffs are committed to fairly and adequately representing and protecting the interests of the Class and have retained competent counsel experienced in complex litigation and class action cases. Plaintiffs have no interests that are antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs that would impair their ability to represent the Class.

138.     Superiority: A class action is superior to other methods for the fair and efficient adjudication of this controversy. The financial harm suffered by individual Class members, while significant, is relatively small compared to the burden and expense of pursuing individual litigation against Defendant. It would be impractical, if not impossible, for members of the Class to effectively redress these wrongs on an individual basis. Moreover, even if Class members could

afford individual litigation, such a process would overwhelm the court system, creating the risk of inconsistent or contradictory judgments based on the same set of facts. Individual litigation would also lead to unnecessary delays and increased costs for all parties and the judiciary. In contrast, a class action allows for the resolution of these common issues in a single proceeding, achieving economies of scale, ensuring consistency, and providing comprehensive oversight by a single court. Under these circumstances, the class action mechanism presents a fair, efficient, and manageable method for addressing the claims at issue.

**COUNT I**
**VIOLATION OF THE FLSA**
**(On Behalf of Plaintiffs and the Collective)**

139.    Plaintiffs incorporate only ¶¶ 9–10 (jurisdiction and FLSA jurisdictional statutes), ¶¶ 16–40 (FLSA employment status, enterprise coverage, uniform control, duties, monitoring, schedules, platform fee, and unpaid time), ¶¶ 46–53 (Dixon overtime and unpaid time particulars), ¶¶ 68–70; 80-102 (Alexander overtime and control particulars), ¶¶ 103-116 (Price overtime and control particulars), and ¶¶ 120-122 (FLSA Collective definition and similarity) for purposes of this FLSA overtime claim.

140.    At all relevant times, Defendant has been and continues to be an employer engaged in interstate commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a), and has had gross revenues in excess of $500,000.

141.    At all relevant times, Defendant has had a willful policy and practice of misclassifying Plaintiffs and similarly situated Contractors as "independent contractors" to, inter alia, avoid paying them appropriate overtime compensation for all hours worked in excess of 40 hours per work week.

33

142.     At times throughout the year, Plaintiffs worked more than 40 hours per week. Despite exceeding the 40-hour threshold, Defendant classified them as Contractors to avoid paying the overtime premium of 1.5 times their regular rate, in violation of the FLSA.

143.     Additionally, Defendant required Contractors to pay a weekly fee of $9.98 to access Defendant's virtual platform, which was essential for performing their work, thereby further reducing Contractors' pay. This fee was deducted directly from the Contractors' payments, effectively reducing their earnings. By contrast, Defendant did not impose this fee on its W-2 employees.

144.     Defendant also routinely required Contractors to attend meetings and other sessions regarding their performance for which they were not compensated. While Defendant compensated Contractors for initial training sessions, additional meetings, performance reviews, and other mandatory sessions were unpaid. Contractors were explicitly instructed by supervisors to attend these sessions as part of their ongoing work with Defendant.

145.     Defendant failed to pay Plaintiffs and similarly situated Contractors time and half for all time worked over forty hours in a work week.

146.     Defendant's Pay Statements and Weekly Timesheets show that Plaintiffs worked more than forty hours and were not paid overtime pursuant to FLSA.

147.     Defendant willfully failed and/or refused to pay overtime pay to Plaintiffs at the time of one and half their regular hourly rate of $16.80.

148.     Defendant's business practice is to lure workers in as independent contractors under the pretense they will have freedom to work independently without control.

149.    Defendant willfully misclassified Plaintiffs and others similarly situated to avoid paying overtime pay in accordance with FLSA.

150.    The financial and operational burdens imposed on Contractors, such as the system access fee and unpaid mandatory meetings, were not required of Defendant's W-2 employees. W-2 employees performing similar tasks were not subjected to these fees or required to attend unpaid sessions

151.    Defendant violated and continues to violate 29 U.S.C. §§ 207,  of the FLSA by not paying Plaintiffs overtime pay and failing to keep and preserve adequate and accurate records of all persons employed in accordance with 29 U.S.C. §§ 211(c).

152.    As a result of Defendant's deliberate refusal to properly compensate their workers, including Plaintiffs and members of the Collective, for all hours worked and for overtime at a rate of time and a half for hours worked beyond 40 in a workweek, for imposing additional, unnecessary fees on Contractors, and for refusing to compensate them for mandatory meetings, Defendant violated and continues to violate the FLSA.

153.    Defendant's actions, as described herein, constitute willful violations of the FLSA under 29 U.S.C. § 255(a).

154.    Because of these violations, Plaintiffs, on behalf of themselves and the Collective, are entitled to recover unpaid overtime wages, an equivalent amount as liquidated damages, and reasonable attorneys' fees, costs, and expenses associated with this action pursuant to 29 U.S.C. § 216(b), as well as the relief outlined in the Prayer of Relief below.

**COUNT II**
**VIOLATION OF SECTION 502(a)(1)(B) OF ERISA**
**(29 U.S.C. § 1132(a)(1)(B))**
**(On Behalf of Plaintiffs and the Class)**

155.    Plaintiffs incorporate only ¶¶ 17–40 (misclassification, integral duties, control, monitoring, fee, and unpaid time), ¶¶ 41-44 (ERISA plan availability and exclusion), and the individual factual paragraphs specific to each Plaintiff concerning misclassification and denial of benefits (Dixon: ¶¶ 47–50; Alexander: ¶¶ 68–102; Price: ¶¶ 103–119), for purposes of this ERISA § 502(a)(1)(B) claim.

156.    Section 502(a)(1)(B) of ERISA [29 U.S.C. § 1132(a)(1)(B)] permits a participant to bring suit to recover benefits due to him or her under the terms of a plan subject to ERISA, to enforce his or her rights under such a plan, or to clarify his or her rights to future benefits under the terms of such a plan.

157.    Defendants have improperly withheld benefits from Plaintiffs and members of the ERISA Class, including but not limited to benefits under Defendants' 401(k) plan, by improperly classifying them as independent contractors rather than employees, despite the significant control Defendants exercised over their work and conditions of employment.

158.    Plaintiffs and members of the ERISA Class were integral to Defendants' business operations, performed work indistinguishable from that of W-2 employees, and met the eligibility criteria for participation in Defendants' employee benefit plans, including the 401(k) plan. However, they were denied access solely due to their misclassification as independent contractors.

159.    As a result of Defendants' improper classification and denial of benefits, Plaintiffs and members of the ERISA Class have suffered financial harm, including the loss of vested benefits, employer contributions, and potential investment growth under Defendants' 401(k) plan. See Vizcaino v. Microsoft Corp., 120 F.3d 1006, 1009–10 (9th Cir. 1997) (en banc).

160. Plaintiffs and members of the ERISA Class seek to recover the benefits unlawfully denied to them under the terms of Defendants' ERISA-governed plans, as well as a declaration clarifying their eligibility for future benefits, as provided by Section502(a)(1)(B) of ERISA, as well as the relief outlined in the Prayer of Relief below.

<u>COUNT III</u>
**BREACH OF FIDUCIARY DUTY**
**VIOLATION OF SECTIONS 404 and 406 OF ERISA**
**(29 U.S.C. §§ 1104 and 1106)**
**(On Behalf of Plaintiffs and the Class)**

161. Plaintiffs incorporate only ¶¶ 17–40 (misclassification and control facts), ¶¶ 41-44 (plan availability/exclusion), and the Plaintiff-specific misclassification allegations (Dixon: ¶¶ 47–50; Alexander: ¶¶ 68–102; Price: ¶¶ 103–119), for purposes of the ERISA fiduciary-duty claim. The remaining allegations in this Count supply the fiduciary status, duty, breach, and causation averments.

162. ERISA requires a fiduciary to act "solely in the interest of participants" with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" for the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These fiduciary duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to act with an "eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982).

163. Instead of loyally and prudently acting in the best interests of participants and beneficiaries, Defendant engaged in systematic and intentional breaches of fiduciary duty by

misclassifying workers as independent contractors rather than employees, thereby denying them participation in the Plan and other employee benefits.

164.     Each year, Defendant acted as a fiduciary under ERISA, as defined by 29 U.S.C. § 1002(21), by exercising discretionary authority and control over the administration of its benefit plans, including decisions regarding eligibility and contributions.

165.     Defendant intentionally misclassified Plaintiffs and members of the ERISA Class as independent contractors to avoid its obligations to contribute to the Plan on their behalf, depriving the Plan of significant assets. This misclassification was deliberate and designed to reduce Defendant's costs while retaining the benefits of employee-like control over Plaintiffs and other members of the ERISA Class.

166.     Defendant breached its fiduciary duties under ERISA by: misclassifying Plaintiffs and the ERISA Class, thereby excluding them from Plan participation; failing to contribute to the Plan on behalf of Plaintiffs and other members of the ERISA Class, as required for eligible employees; omitting required disclosures and notices regarding Plan benefits, depriving Plaintiffs and members of the ERISA Class of the ability to make informed decisions about their rights and benefits.

167.     Defendant's actions directly benefitted itself at the expense of Plan participants by avoiding contributions to the Plan and withholding benefits owed under ERISA. These actions constitute self-dealing and violations of 29 U.S.C. § 1106(b)(1), which prohibits fiduciaries from engaging in transactions that benefit themselves at the expense of Plan participants.

168.     Defendant further breached its fiduciary duties by failing to prudently and diligently review the terms and administration of the Plan to ensure compliance with ERISA and by failing to act in the sole interest of Plan participants.

169.     As a direct and proximate result of these breaches, the Plan was deprived of significant contributions, and Plaintiffs and members of the ERISA Class were unlawfully denied benefits, causing financial harm to the Plan and its participants.

170.     Plaintiffs bring this action on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2) and seek relief under 29 U.S.C. § 1109(a), including but not limited to: restitution to Defendant's benefit plans of all amounts unlawfully withheld; disgorgement of all profits or unjust enrichment gained by Defendant through its breaches of fiduciary duty; restoration of all Plan benefits owed to Plaintiffs and the ERISA Class, including employer contributions and lost earnings; an injunction to prevent further violations and ensure future compliance with ERISA.

171.     Defendant's ongoing misclassification scheme and failure to contribute to the Plan have caused millions of dollars in losses to the Plan and its participants, warranting immediate equitable and legal relief.

172.     Plaintiffs and the ERISA Class request all appropriate remedies, including monetary and equitable relief, to redress the harm caused by Defendant's breaches of fiduciary duty, including but not limited to the relief outlined in the Prayer of Relief below.

**COUNT IV**
**RETALIATION UNDER THE FLSA**
**(29 U.S.C. § 215(a)(3))**
**(On Behalf of Plaintiffs, Individually and on Behalf of Similarly Situated Individuals of the Collective)**

173.    Plaintiffs incorporate only the allegations constituting protected activity and retaliation and the contextual FLSA employment facts: ¶¶ 16–18 (FLSA employee/employer allegations), Plaintiff Dixon's protected activity and resulting termination (¶¶ 65–67), Plaintiff Alexander's protected activity and adverse actions (¶¶ 71–92, 94–98), and Plaintiff Price's protected activity and adverse actions (¶¶ 105–118).

174.    This claim is brought by Plaintiffs on behalf of themselves and similarly situated individuals under the § 216(b) Collective for retaliation under 29 U.S.C. § 215(a)(3).

175.    The FLSA prohibits employers from retaliating against employees who complain about or oppose unlawful wage and hour practices, including but not limited to misclassification as independent contractors, non-payment of overtime, and other wage theft practices.

176.    Plaintiffs, and on belief, other similarly situated workers, repeatedly raised concerns with Defendant's supervisors and HR representatives about their misclassification as independent contractors, their unpaid overtime, and Defendant's excessive control over their work. These complaints constituted protected activity under the FLSA.

177.    Specifically, Plaintiffs:

a.  Raised concerns about the misclassification of contractors and unpaid overtime in January and February 2024, both in internal meetings and directly to HR in a March 11, 2024 Teams call. Dixon was terminated on March 29, 2024, just weeks after formally raising her misclassification concerns;

b.  Questioned overtime pay and work conditions in August–October 2023, asking why they were denied overtime pay. After participating in shift bidding in early 2024, Alexander's hours were reduced, and she was later terminated in November 2024;

c.  Raised concerns about unpaid overtime and wage discrepancy in early 2024. Price specifically questioned the lack of overtime pay and inquired about inconsistencies with paid time off. Price also inquired about the misclassification and being denied benefits in August 2024, prior to her termination; and

40

      d.  Upon information and belief, other similarly situated workers also raised concerns about their misclassification and were terminated or had their hours reduced as a result.

178.   Defendant engaged in a pattern of retaliatory conduct against workers who questioned their classification as Contractors and pay, including but not limited to:

      a.  Sudden termination without prior warnings;

      b.  Reduction in hours after raising concerns about classification; and

      c.  Targeted removals from shifts or teams following complaints.

179.   Defendant's actions violated § 215(a)(3) by retaliating against Plaintiffs and similarly situated Contractors for engaging in protected activity under the FLSA.

180.   As a direct and proximate result of this unlawful retaliation, Plaintiffs and the similarly situated workers have suffered lost wages, emotional distress, and other damages.

181.   Plaintiffs, individually and on behalf of the collective, seek all relief available under § 216(b), including but not limited to:

      a.  Reinstatement or front pay, where applicable;

      b.  Back pay for lost wages;

      c.  Liquidated damages in an amount equal to lost wages;

      d.  Punitive damages to deter future retaliation;

      e.  Attorneys' fees and costs as allowed by law; and

      f.  Such other and further relief as the Court deems just and proper.

**<u>COUNT V</u>**
**VIOLATION OF SECTION  510 OF ERISA, 29 U.S.C. § 1140**
**(On Behalf of Plaintiffs, Individually and on Behalf of the Class)**

182.    Plaintiffs incorporate only the allegations constituting ERISA-protected activity and ERISA-related adverse actions and context: ¶¶ 41-44 (plan availability/exclusion), Plaintiff Dixon's ERISA-related complaints and termination (¶¶ 65–67), Plaintiff Alexander's ERISA-related complaints and adverse actions (¶¶ 71–92, 94–98), and Plaintiff Price's ERISA-related complaints and termination (¶¶ 112–118).

183.    Plaintiffs engaged in protected activities under ERISA by objecting to and raising concerns about Defendant's unlawful misclassification scheme, which Defendant implemented to deny them and similarly situated Contractors participation in ERISA-governed employee benefit plans, including retirement and healthcare plans.

184.    Plaintiffs specifically raised concerns with Defendant's supervisors, HR representatives, and managerial staff regarding their improper classification as independent contractors, which resulted in their unlawful exclusion from receiving ERISA-protected benefits to which they were entitled as employees.

185.    Defendant retaliated against Plaintiffs due to their exercise of ERISA-protected rights and their complaints about the denial of ERISA benefits by engaging in adverse employment actions, including, but not limited to:

   a. Plaintiff Dixon being terminated without explanation shortly after formally raising concerns about misclassification as a Contractor and denial of ERISA-governed benefits;

   b. Plaintiff Alexander having her work hours reduced and subsequently being terminated without explanation shortly after objecting to her misclassification as a Contractor and raising concerns regarding her exclusion from ERISA-protected employee benefit plans; and

   c. Plaintiff Price being terminated shortly after raising concerns about misclassification as a Contractor and denial of ERISA-governed benefits.

186.    Defendant's actions were undertaken with specific intent to retaliate against Plaintiffs for exercising their ERISA rights, to interfere with their entitlement to employee benefits under ERISA, and to discourage Plaintiffs and other workers from asserting their rights under ERISA.

187.    Defendant's conduct was intentional, malicious, and carried out with reckless disregard for Plaintiffs' ERISA-protected rights.

188.    As a direct and proximate result of Defendant's retaliatory and discriminatory conduct under Section 510 of ERISA, Plaintiffs suffered substantial economic harm, including lost wages and lost benefits, as well as non-economic harm, including emotional distress and reputational damage.

189.    Plaintiffs seek all available relief, including but not limited to:

   a.   Reinstatement to their former positions or front pay in lieu thereof;

   b.   Back pay, restoration of lost wages, and the value of lost ERISA benefits;

   c.   Compensatory damages for emotional distress and reputational harm;

   d.   Equitable relief, including surcharge, restitution, and disgorgement of any unjust enrichment Defendant derived from its violations;

   e.   Removal of the fiduciaries responsible for managing the ERISA-governed plans, and appointment of independent fiduciaries to manage these plans in compliance with ERISA;

   f.   Injunctive relief prohibiting Defendant from further retaliatory actions against Plaintiffs and similarly situated employees exercising ERISA-protected rights;

   g.   Attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

43

h.   Such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class, and the Collective, respectfully request that this Court:

A.   Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives, and appoint the undersigned attorneys to act as Class Counsel;

B.   Certify this action as a collective action under 29 U.S.C. § 216(b) of the Fair Labor Standards Act, and direct notice to all similarly situated individuals, allowing them to opt into this action;

C.   Issue a declaratory judgment that Inktel has violated FLSA and ERISA by misclassifying its Contractors as independent contractors, failing to pay them overtime, and denying them participation in employee benefit plans;

D.   Issue an Order requiring Inktel to reimburse all current and former Contractors for unpaid wages and overtime compensation, along with an equal amount as liquidated damages under 29 U.S.C. § 216(b);

E.   Issue an Order finding that Inktel breached its fiduciary duties under ERISA, 29 U.S.C. § 1104, by misclassifying Contractors and failing to make contributions to the Plan on their behalf;

F.    Require Inktel to provide a full accounting of all amounts unlawfully deducted from Contractors, including the $9.98 weekly access fee and uncompensated time spent in meetings and training sessions, and restore such amounts to the Contractors;

44

G.      Issue declaratory and injunctive relief requiring Inktel to: (i) stop misclassifying Contractors as independent contractors; (ii) enroll Contractors in all ERISA-governed benefit plans retroactively to the date they were improperly excluded; (iii) pay all amounts owed to the Plan on behalf of the Contractors, including missed contributions and interest; (iv) reimburse for all medical expenses incurred for being denied enrollment in medical plans; (v) ensure future compliance with the FLSA and ERISA; (vi) disgorge any benefits or profits obtained by Defendant through its misclassification scheme, including the amounts saved on Plan contributions and wage obligations; (vii) cease retaliating against Contractors who raised concerns about their misclassification and working conditions, in violation of public policy and the Florida Whistleblower Act, Fla. Stat. § 448.101, *et seq*., and enjoin Inktel from engaging in any further retaliatory conduct;

H.      Award Plaintiffs and the Class and Collective compensatory damages, including damages for emotional distress caused by Inktel's intentional and willful violations of applicable laws and retaliatory actions against Plaintiffs and similarly situated Contractors;

I.      Award Plaintiffs and the Class and Collective punitive damages in an amount sufficient to punish Inktel for its willful, malicious, and reckless disregard of Plaintiffs' and similarly situated Contractors' rights under the FLSA, ERISA, and Florida Whistleblower Act, and to deter such misconduct in the future;

J.      Order the establishment of a constructive trust consisting of all amounts that Inktel should have contributed to ERISA-governed benefit plans, plus interest and profits earned thereon, for the benefit of Plaintiffs and Class members;

K.      Order the disgorgement of all profits and financial benefits Inktel received due to its breaches of fiduciary duty and violations of ERISA;

L.      Order the removal of the current fiduciaries responsible for managing and administering the ERISA-governed benefit plans and appoint independent fiduciaries to manage these plans in compliance with ERISA;

M.      Award Plaintiffs and the Class and Collective pre-judgment interest on all unpaid wages, benefits, and damages as allowed by law;

N.      Award Plaintiffs and the Class reasonable attorneys' fees, expenses, and taxable costs, as provided under 29 U.S.C. § 216(b), 29 U.S.C. § 1132(g), Fla. Stat. § 448.104, and any other applicable law;

O.      Permanently enjoin and restrain Inktel, its officers, agents, servants, employees, and all persons in active concert or participation with Inktel from continuing to violate the FLSA, ERISA, and other applicable laws; and

P.      Grant such other and further relief as the Court may deem just, equitable, and proper under the circumstances.

## **<u>JURY DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38 and 29 U.S.C. § 626, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

Dated: February 11, 2026             Respectfully submitted,

**SIRI │ GLIMSTAD LLP**

By: _/s/ Jessica Wallace_____
Jessica Wallace (Bar No. 1008325)
Walker D. Moller (*pro hac vice*)
Oren Faircloth (*pro hac vice*)
William H. Payne *(pro hac vice)*
20200 W. Dixie Highway, Suite 902
Aventura, FL 33180
Tel: (717) 967-5529
E: jwallace@sirillp.com
E: wmoller@sirillp.com
E: ofaircloth@sirillp.com
E: wpayne@sirillp.com

*Attorneys for Plaintiff and the Proposed Class*